IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

PADEN McCULLOUGH and
FRANK BENSIECK                                                             PLAINTIFFS

VERSUS                                                                                 NO. 1:05CV42

CITY OF TUPELO, MISSISSIPPI,
TUPELO-LEE HUMANE SOCIETY and
SHEILA HORTON, in her individual capacity                            DEFENDANTS

_____

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
SEPARATE DEFENDANT, CITY OF TUPELO, MISSISSIPPI**
_____

COMES NOW Defendant, City of Tupelo, Mississippi, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and files this Brief in Support of Summary Judgment, and in support thereof would show unto the Court the following:

**INTRODUCTION**

This case involves the alleged unlawful seizure of three adult and eight pit bulldog puppies. The Plaintiff brings this Section 1983 action claiming, among other things, that the City of Tupelo, acting jointly with the Tupelo-Lee Humane Society and one of its employees, caused an unconstitutional deprivation of pit bulldogs as the seizure occurred without a warrant and because the Tupelo ordinance defines pit bulldogs as "dangerous."

As will be shown herein below, the American pit bulldogs in question were, by definition as set forth in the Municipal Ordinance of the City of Tupelo, dangerous animals by nature of their breed. Two of the animals broke out of the McCullough backyard and entered into the

property of a neighbor. This violates Section 6-67 of the Code which deals with animals running at large.

When an animal is "running at large" as will be shown herein, the Municipal Code allows them to be seized. When a person possesses a "dangerous animal" as defined by the Tupelo City Code, the owner of the animal must first obtain a license or permit issued from the City. Failure to do so is a violation of the City Code. Additionally, after pit bulldogs are licensed, if an owner desires to keep them within the City limits, he must post a warning giving the general public notice of the presence of the dangerous animal. Additionally, animals kept outside of a home structure must be kept in a properly confined pen, the specifications of which are provided in the City Code. In this case, McCullough had not constructed a proper pen, and the animals were not inside the pen that they had. The Tupelo City Code allows a seizure of a dangerous animal who is not the subject of a proper license, running at large, dangerous, not properly penned, etc. and allows for a hearing to be held after the fact. As will be shown herein, these Tupelo City Code provisions are statutorily and legally valid, and Plaintiffs have suffered no deprivation of property in violation of their constitutional rights as alleged. Moreover, even if Plaintiffs suffered a deprivation, there are adequate post-deprivation remedies available to them. Therefore, the City of Tupelo is entitled to summary judgment on all claims.

## UNDISPUTED MATERIAL FACTS

Plaintiffs, Paden McCullough and Frank Bensieck, were students operating a business of selling dogs from their residence in Oxford, Mississippi. They claim that, on December 29, 2004, McCullough was at home visiting his parents, Mike McCullough and Katherine McCullough, in Tupelo and that he brought to the McCullough's Tupelo home three adult American pit bull terriers and eight 4-week old puppies of one of the American pit bulls. (2nd

581529

Amended Complaint, ¶ IV).  Although the Plaintiffs grew up in Tupelo, they were ignorant about the Tupelo City Code provisions classifying pit bull terriers as "dangerous animals." (Id.)

Plaintiffs further allege that on December 29, 2004, without the Plaintiffs' knowledge, two of the adult pit bull terriers dug through the fence of the McCullough property and escaped onto a neighbor's property. (2nd Amended Complaint, ¶ V). McCullough's dogs apparently dug through to get at the neighbor's dog. They entered onto the property of Brandi Fletcher at her home at 1448 Columbine Drive and attacked her female setter. According to the Tupelo Police Department Incident Report No. 2004 028390, Ms. Fletcher heard a commotion in her backyard and saw the adult pit bulldogs attacking her female setter. (See Incident Report attached as Exh. "1" to Motion; Report of Clay Hassell included in Incident Report.)  When Ms. Fletcher opened her back door to walk outside and attempt to make the dogs leave, they turned and ran at her in a threatening manner and forced Ms. Fletcher back into her house for protection.  It took Ms. Fletcher three attempts to rescue her setter before she was finally able to successfully get her dog back into her house. (Id.)

The Incident Report also states that Ms. Fletcher called 911 to report the pit bulldogs that were running at large in her backyard. A short time after the call, the police, as well as the animal control officers employed by the Tupelo-Lee Humane Society, arrived at the Fletcher residence. When the officers went into the Fletchers' backyard, Mr. McCullough's pit bulldogs charged at them. One animal control handler was able to get a choke pole on one of the dogs but was dragged to the ground, but he ultimately got control of the pit bull and placed it in a cage in the animal control officer's truck.  The officers then went to the McCullough residence and attempted to make contact with the resident but could get no one at the door. (Id.)

581529

3

Since the fence to the property was obviously not secure and the adult pit bulls could escape, the animal control officers entered with the idea of seizing the dogs. Finally, Paden McCullough came to the back door, and Officer Clay Hassell of the Tupelo Police Department instructed Paden McCullough to follow the instructions of the Humane Society personnel who were in the process of capturing the remaining pit bulldogs. It being obvious that one of the adult dogs had given birth to puppies, the Tupelo police officer and the animal control officers inquired where the puppies were. According to the Complaint, Paden McCullough informed the officers that the puppies were in the garage and the officer instructed the Plaintiff to bring the puppies to the officer. McCullough then did so. (Complaint, ¶ V, VI). They then informed McCullough that he was in violation of numerous City Code provisions involving the possession of dangerous animals and McCullough voluntarily turned the four dogs and eight puppies over to the officers. (<u>See</u> Tupelo Police Department Incident Report).

The Complaint alleges that the Tupelo City Ordinance unconstitutionally allows the seizure of puppies without a warrant or due process hearing. It also complains that it is over broad because it defines a pit bull terrier as "dangerous" even without evidence that the animal is, in fact, dangerous. Plaintiffs also claim that the Municipal Code unlawfully permits the seizure of an animal classified as dangerous and that the animal may be held until such time as a fine is paid and that this provision violates due process. Plaintiffs complain that it is unconstitutional because it permits the City to extract a fine without notice or hearing. (Complaint, ¶ VIII). Finally, the Complaint alleges that the animal control officers are without authority to issue citations or to seize animals since they are without law enforcement training. (Complaint, ¶ XIV).

581529

4

Plaintiffs claim that the eight puppies died as a result of contracting a disease that the puppies were exposed to at the Humane Society shelter. (Complaint, ¶ XVI).

## DISCUSSION

In his deposition, McCullough admitted that the dogs were frequently kept in the backyard and that they were not kept in a pen of the sort prescribed by the City Code. He admitted he did not register the pit bulls with the City of Tupelo and that two of the adult pit bull terriers dug under the fence and went into the neighbor's yard. He also admitted that, although the parents had a pen in the yard, it did not meet the specifications of the Code and the pit bulldogs were not even placed in the pen. McCullough admitted he did not have a muzzle for any of his dogs, nor did he have any sort of chain or run attached to the dogs to prevent their escape from the yard. (Depo. of Paden McCullough, pp. 96-101).

A. **PLAINTIFFS VIOLATED MANY PROVISIONS OF THE TUPELO ANIMAL CONTROL ORDINANCE**

Article 5 of the Tupelo Animal Control Ordinance sets forth the definitions of animals that are considered dangerous. Dangerous animals include:

> any pit bull terrier, which shall be herein defined as any Staffordshire bull terrier breed of dog or any mixed breed of dog which contains as an element of its breeding the breed of Staffordshire bull terrier or American Staffordshire bull terrier so as to be identifiable as partially of the breed of Staffordshire bull terrier or American Staffordshire bull terrier by any qualified veterinarian duly licensed as such by the State. Any domestic dog or cat that exhibits any of the following characteristics: without provocation approaches, in a threatening or terrorizing manner, any person in an apparent attitude of attack, or exhibits any behavior that constitutes a physical threat of bodily harm to a person upon the streets, sidewalks, any public or common grounds or places, or any place where such person is conducting himself peaceably and lawfully;

(TUPELO CITY CODE, ARTICLE 5, § 6-96, Article attached as Exh. "2" to Motion; §6-96 at p. 295).

The adult pit bulldogs were dangerous animals. (Depo. of Dr. John Morris at pp. 28-31; relevant portions attached to depo. as Exh. "4"). They were American pit bull terriers, by

581529

5

admission of the Plaintiffs, and as alleged in the Complaint. Additionally, two of the adult pit bull terriers actually did threaten the neighbor according to the Tupelo Police Department report and are dangerous as a result of their conduct as well as their breed.

### 1. FAILURE OF THE PLAINTIFFS TO HAVE A LICENSE

Section 6-97 of the Tupelo City Code provides that:

> (a)  No dangerous animal may be owned, kept, possessed or harbored within the City without the owner or person in possession or control of such animal first obtaining a license or permit from the City….
>
> (b)  Persons owning or in possession or control of dangerous animals shall, upon the birth, death or transfer of such animals, report the fact to the City. A separate license or permit shall be issued for each such dangerous animal.

(TUPELO CITY CODE, ARTICLE V, § 6-97, Exh. "2" at p. 256).

McCullough admitted in his deposition that neither he nor Mr. Bensieck obtained a license or permit from the City for their dangerous animals. (McCullough depo. at pp. 94-95).

### 2. THE PLAINTIFFS' FAILURE TO PROPERLY POST THE PREMISES

The Tupelo Municipal Code states that, when a person possesses a dangerous animal, they are supposed to post the premises. Section 6-98 states:

> (a)  All premises upon which a dangerous animal is kept, possessed or harbored, shall be posted with signs that are conspicuously visible to the public and legible from the property, public or private, adjacent to such premises. Such signs or notices shall contain letters not less than 2" in height and a message sufficient to warn the general public of the presence of the dangerous animal….
>
> (b)  The absence of any required sign shall be considered prima facie evidence of a violation of this section….

(TUPELO MUNICIPAL CODE, ARTICLE V, § 6-98, Exh. "2" at pp. 296-97).

By the Plaintiff's admission in the deposition of Paden McCullough as cited above, the Plaintiff had not posted the notice on their premises warning the general public with the type of warning that is required under the Code. (McCullough depo. at pp. 95-96).

581529

### 3.     FAILURE TO CONFINE THE PIT BULLDOGS

The Tupelo City Code has a number of requirements with regard to the type of confinement in which a dangerous animal must be kept. Section 6-99 of the Tupelo City Code provides:

> (a)     All dangerous animals shall be kept confined within the residence or other permanent structure on the premises of the owner or other person in possession or control of such animals or within an enclosure as defined in this section.
>
> (b)     All dangerous animals to be kept on the premises of the owner or person having possession or control of such animals and not within the residence or other permanent structure shall be confined within a fence or a structure area of at least 4 feet in height,…effective in containing a dangerous animal. Such enclosure shall be securely closed and locked and equipped with secure sides, top and bottom, and shall be designed to prevent the animal from escaping the enclosure. The bottom of such enclosure shall be concrete, and the sides and the top shall be constructed of steel wire or other material sufficient to prevent the animals from escaping the enclosure….
>
> (c)     Such enclosure, fence or structure must be at least five feet from any fenced property line of the owner or person in control or possession of such animals, provided that such enclosure, fence or structure is within a separately and totally enclosed fenced area. In the event that the area of the property of the owner or person in control of such animals devoted to the confinement or enclosure is not within a separately and totally enclosed fenced area, any animal confined in such enclosure must be securely tethered or otherwise restrained so that they cannot come within five feet of the walls of the enclosure or area in which they are defined.
>
> (d)     No dangerous animal shall be allowed outside of the residence or required enclosure unless it is securely muzzled and restrained with a chain having a minimum tensile strength of 300 pounds and not exceeding 3 feet in length and under the direct control and supervision of the owner.

(TUPELO CITY CODE, ARTICLE V, § 6-99, Exh. "2" at p. 97).

McCullough admitted that the pit bull terriers that were in the backyard were not in a properly constructed pen as required by the Code, were not tethered or otherwise restrained, were not muzzled and were not on any sort of a chain whatsoever, and they were allowed to escape

581529

7

and were running at large. (McCullough depo. at pp. 96-98). Clearly, this violated Section 6-99 of the Tupelo City Code.

### B. DUE PROCESS

#### 1. DETERMINATION OF DANGEROUS ANIMAL STATUS, IMPOUNDMENT, REDEMPTION, AND DISPOSITION

Section 6-100 of the Tupelo City Code provides the methods and the means for the seizure and impoundment of dangerous animals and how the owner has due process rights. Section 6-100 of the Tupelo City Code states:

> (a) Any police officer or any other lawfully designated official or representative of the City shall have the right to enter any private property for the purpose of inspecting the property for the presence of dangerous animals or for the performance of other duties in the enforcement of this article. Any police officer or other lawfully designated official or representative of the City having probable cause to believe that an animal is dangerous shall conduct or cause to be conducted an investigation into the facts of each case. The owner of the animal shall be notified of the investigation and shall have an opportunity to present evidence as to why the animal should not be determined to be dangerous….
>
> (b) Should any police officer or other designated official or representative of the City have reason to believe that an animal is vicious and may pose a threat of serious harm to persons or other domestic animals, the officer or official may immediately seize and impound the animal pending an investigation as described in this section.
>
> (c) Any officer or other lawfully designated official or representative of the City upon complaint by a citizen or upon its own initiative may make inquiries to determine compliance with this article and may seize and impound any animal found in violation of any of its provisions.

(TUPELO CITY CODE, ARTICLE V, § 6-100, Exh. "2" at pp. 297-98).

Based upon this provision, it is clear that the owner is given notification of an investigation and an opportunity to present evidence about why his animal is not dangerous. This is set forth clearly in Paragraph (a) of Section 6-100. Further, after the animal is seized and cited for violation of the Tupelo City Code provisions, if they do not pay the fine, they have an

581529

opportunity to be heard in City Court and may be issued a fine after the hearing (or acquitted). Further, McCullough did have notice and an opportunity to be heard, since by his own admission he paid the fine at City Court for the adult dogs having been running at large. (See Amended Complaint at ¶ X). In this case, such notice and opportunity to be heard takes place in a post-deprivation proceeding. Therefore, it is hard to understand how Plaintiffs can argue that there is a due process violation and a lack of notice and opportunity to be heard.

### 2. PLAINTIFFS' HAVE NO CLAIM FOR DUE PROCESS VIOLATION

Plaintiff next complains that his animals were seized without advance notice and a pre-deprivation hearing. However, a pre-deprivation hearing is not required. Deprivation of property is actionable under Section 1983 only when it is accompanied without due process and that the temporary deprivation of property of slight value requires only modest process consistent with a sliding scale approach. It is well established that post-deprivation remedies made available by the state can satisfy due process concerns. Parratt v. Taylor, 451 U.S. 527, 538 (U.S. 1981). A hearing at a meaningful time and in a meaningful manner does not *always* require the state to provide a hearing before the initial deprivation of property. The rationale is based in part on the assumption that at some time a full and meaningful hearing will be available. Parratt, 451 U.S. at 541. Nothing in the Tupelo Municipal Code requires that the animal control officer for the City of Tupelo obtain a warrant before seizure of an animal unlawfully held in violation of the Tupelo City Code. In fact, the ordinance allows the police or other lawfully designated agent to enter private property to inspect. Here the back yard was not secure and the pit bulls could get out. Thus, it was illogical to have a pre-deprivation hearing. There is no constitutional violation in this case.

In fact, the fundamental requirement of due process is the opportunity to be heard, and it is an "opportunity" which must be granted at a meaningful time and in a meaningful manner. Parratt, 451 U.S. at 540. In this case, Bensieck and McCullough, even in the language of the Complaint, admit they appeared before the Municipal Court and some of the citations they received were dropped, and they paid the fine for the two adult pit bulldogs that were running at large and attacked the neighbor and her dog. (See Amended Complaint at ¶ 10). The Plaintiffs also admit in the Second Amended Complaint the Humane Society released the eight pit bulldog puppies to them within two days of their original impoundment, notwithstanding the admission of the Plaintiffs that, for the health of the dogs, it was better that they remain with their mother.

A recently decided case which appears directly on point is Wall v. City of Brookfield, 406 F.3d 458 (7th Cir. 2005). In this case, the court held that no notice or pre-seizure hearing was required under the due process clause for a town-authorized seizure and holding of an intimidating dog by the local humane society. The court said that the owner had failed to control the dog, and the dog was picked up at a location where a pre-hearing was impractical and the owner still had an opportunity to seek the dog's return under the law available to him in the state and, therefore, was provided for a post-deprivation hearing. In that case, Justice Posner, writing for the 7th Circuit, stated in affirming the summary judgment of the court below:

> This is nuisance litigation that the federal judiciary does not need. So we affirm the judgment but at the same time issue the plaintiff an order to show cause why she should not be sanctioned for not making a frivolous argument in a meritless case.

Wall v. City of Brookfield, 406 F.3d 458, 459 (7th Cir. 2005).

Closer to home, the United States District Court for the Eastern District of Texas in Gall v. City of Vidor, Texas, 903 F.Supp. 1062 (E.D. Tex. 1995) held that the alleged mishandling of dogs during impoundment, warrantless entry onto property and seizure of dogs, and a post-

seizure return of dogs satisfied the owner's due process rights notwithstanding the lack of a warrant.  In this case, the Plaintiffs were guilty of numerous violations of the Tupelo Municipal Code.  They allowed their adult pit bulldogs to run at large, and to attack a neighbor's dog and the neighbor herself, and thereby brought attention to their lack of compliance with numerous provisions of the Municipal Code regarding licensing, proper pen, muzzling, tethering, and posting of premises.  It was reasonable under the Tupelo Municipal Code for the animal control officers acting jointly with the Tupelo City Police as alleged in the Second Amended Complaint, to enter the property and to seize the dogs.  Plaintiffs were afforded a post-deprivation hearing, and each and every one of the dogs was returned to them.  Therefore, Plaintiffs' due process claim should be dismissed.

      **C.**    <u>**CONSTITUTIONALITY OF THE TUPELO CODE**</u>

          **1.**    <u>**THE UNUSUAL CHARACTERISTICS OF A PIT BULLDOG NECESSITATE BREED-SPECIFIC LEGISLATION**</u>

One has to consider exactly how pit bulldogs are different in considering whether breed specific legislation is overbroad as alleged in the Complaint.  The types of dogs that share the common definition of "pit bull" derive their heritage from "the butcher's dog" developed through the sport of bull baiting in England.  Pit bulldogs were intentionally bred to result in better, stronger and bolder dogs, more inclined to engage in the dangerous behaviors likely to win in the ring.  Coal mining communities in Staffordshire County, England also brought pit bulldogs to the coal pits to fight.  The breed was manipulated to be better at fighting other dogs than bulls; the dogs needed to be quicker and more agile and not signal their intentions through their body posture as most dogs do.  This eventually resulted in smaller, tenacious terriers, types which became known as the American pit bull terrier and the American Staffordshire terrier and

581529

11

the Staffordshire bull terrier. D. CAROLINE COILE, PIT BULLS FOR DUMMIES 9 (WILEY PUBLISHING, INC. 2001).

The most significant point about the justification for bans or restrictions on the ownership of pit bulls is that such statutes and ordinances are not dependent upon a claim that every pit bull has a higher than average propensity for attacking humans. The justification is based upon the clear evidence that, as a group, pit bulls compared to other breeds, generally have a higher propensity to exhibit unique behavioral traits during an attack. These behaviors have a higher likelihood of causing more severe injuries or death. A recent case where many of the characteristics of the pit bulldog were described is Colorado Dog Fanciers, Inc. v. City and County of Denver, 820 P. 2d 644 (Colo. 1991).

In this case, the court heard expert testimony that pit bulls are extremely muscular and unusually strong for their size, generally stronger than many other dogs. It was also established that while pit bulls are one of many aggressive types of dogs, their temperament varies in the same manner as other dogs, and they can make gentle pets. However, the court recognized one study which reported that over 13% of pit bulldogs attack their owners as compared with just over 2% of other dogs. Colorado Dog Fanciers, 820 P.2d at ¶ 28. According to the court, pit bulldogs, unlike other dogs, often give no warning signals before they attack and are trained for fighting and are valued for their "gameness" which is their refusal to give up after beginning a fight. Pit bulls also have a high tolerance for pain, and when attacked, generally do not retreat. Pit bulls also generally tend to attack the deep muscles and to hold on and shake and cause a ripping of tissue as opposed to the manner in which other dogs bite. (Id.).

Even the Plaintiff McCullough recognized that pit bulldogs were bred for bringing down big animals like bulls. He also testified that it is included in their breeding that they can latch on

with their jaws and are powerful enough that they can hold on until they suffocate whatever they are trying to kill. (Dep. of Paden McCullough, pp. 107-109).

The Plaintiffs' own expert witness, Dr. John Morris, DVM, testified that the pit bull terrier is capable of inflicting serious bodily harm or death to a human being. Dr. Morris admitted that pit bulldogs were bred and trained with a specific purpose to attack and kill other dogs. According to Dr. Morris, this is called "an inherent inter-dog aggression". Dr. Morris stated that is what they are bred for and why the breed was established and, to the extent an American pit bull terrier may escape and be running at large, that it would be a hazard to other dogs greater than the average dog would be to other dogs as a result of its breeding. Dr. Morris also stated that pit bull terriers, when they bite, do not tend to let go, and that was the way they were trained to kill other dogs. Dr. Morris admitted that if a pit bulldog bit a person, its bite is actually more hazardous to people than other dogs' bites because of this tendency. In fact, Dr. Morris admitted that the pit bull terrier is one of the most dangerous dog breeds around as far as being dangerous to people if it did, in fact, attack. (Depo. of Dr. John Morris, pp. 28-31).

Of course, this Court can take judicial notice that pit bulldogs running at large do indeed cause a heightened danger to the citizenry wherein they run. The news frequently has articles about the effects of pit bulldogs running at large. In December of 2005, <u>The Clarion Ledger News</u> reported about the conviction of an owner of pit bulldogs in Spotsylvania, Virginia, who allowed her pit bulldogs to run at large and which dogs killed an 82-year old woman. (Article attached as Exh. "5" to the Motion).

An excellent commentary on the dangerous nature of pit bulldogs and a position as to why pit bulls are more dangerous and breed specific legislation is justified may be found in the July/August edition of <u>The Municipal Lawyer Magazine</u>, Volume 46, No. 6.

581529

The article titled "One City's Experience, Why Pit Bulls Are More Dangerous and Breed Specific Legislation is Justified" by Kory A. Nelson[1], explains quite clearly why an ordinance or statute which specifically addresses and defines a pit bull terrier as a dangerous animal is rationally related to a legitimate government purpose. The article was written about litigation between the Denver, Colorado and the Colorado Legislature and dealt with whether Denver could have a breed-specific ordinance classifying pit bulls as dangerous. The court reaffirmed in April of 2005 what the court had already ruled in 1991 – that such ordinances are not unconstitutional and that a state statute proscribing such ordinances was itself unconstitutional. Here, the burden is on Plaintiffs to prove unconstitutionality. Plaintiffs have offered no expert testimony tending to show that pit bull terriers are not more dangerous than other breeds. In fact, the Plaintiff's own expert readily admits (as does the Plaintiff himself) that pit bulldogs are more dangerous than your average breed.

Thus, whether or not McCullough and Bensieck's pit bulldogs were as a matter of fact friendly does not change the fact that pit bulldogs, as a breed, are dangerous animals, who, if provoked, can cause serious bodily injury or death. Plaintiffs' position is that their dogs are not dangerous, but the police report and the facts in this case indicate the opposite.

D.  **LACK OF PROXIMATE CAUSE TESTIMONY**

Not only do Plaintiffs fail to show a due process violation, they cannot establish that the pit bull puppies contracted Parvo at the Humane Society. Plaintiffs allege that the eight pit bulldog puppies, after having been retrieved from the Tupelo-Lee Humane Society, died as a result of contracting some disease at the Tupelo-Lee Humane Society. Plaintiffs have tendered Dr. John Morris as an expert witness to testify as to the proximate cause. However, Dr. Morris unabashedly admits that he never did a necropsy on any of the dogs. (Depo. of Dr. John Morris,

---

[1] This article may be accessed on the internet at www.dogbitelaw.com/pitbullDenver.pdf.
581529

14

p. 15). Therefore, Dr. Morris admits he does not have a "definitive diagnosis" that it was Parvo. (Id.) Dr. Morris also admits that it would be very difficult for him to testify as to what caused the death of the Plaintiffs' puppies or where they contracted the disease that killed them. (Id.) Dr. Morris also did not do anything in an effort to rule out other possible locations where the puppies have contracted whatever it was they died of. (Morris depo. at p. 52). Finally, Dr. Morris admits that he has no forensic training to give him an ability to rule out locations where the Parvo virus may have been contracted or whatever the virus was that resulted in the death of the pit bulldog puppies. (Id. at p. 53).

In a nutshell, Plaintiffs cannot prove to a reasonable degree of probability through expert testimony what killed the pit bulldog puppies or where they contracted it. Therefore, neither of the Defendants can be liable as a matter of law for the death of these puppies.

E. **PLAINTIFFS CANNOT RECOVER FOR EMOTIONAL DISTRESS**

Tupelo adopts the Motion of the TLHS and the arguments made therein on the issue of inability to recover emotional distress damages for damage to personal property.

## CONCLUSION

In this case, each and every one of the Plaintiffs' allegations fail as a matter of law. Plaintiffs violated numerous provisions of the Tupelo animal control ordinance. Plaintiffs' ignorance of the Municipal Code provisions should not excuse their unlawful behavior. Had the Plaintiffs complied with the Tupelo Municipal Code, the adult pit bulldogs, including the mother of the eight puppies, which was running at large, would never have been seized. Because the Plaintiffs admit that the health of the puppies necessitated their being with the mother, and the mother was properly seized as being a dangerous animal pursuant to the Tupelo City Code, the animals were all properly taken. Further, because the Plaintiffs had not obtained licenses for the

puppies, they were properly taken. Plaintiffs have failed to show that the puppies were killed as a result of any action on the part of the City or the Humane Society. Breed specific legislation is rationally related to a legitimate government purpose and the Plaintiffs are not a member of any suspect class, and the legislation at issue does not impact a fundamental right. Plaintiffs have failed to meet their burden of proving to the court that breed specific legislation is overbroad and, in fact, through their testimony and the testimony of their expert, appear to concede that breed specific legislation is legitimate based on their statements that the pit bull terrier has dangerous propensities and was bred for that purpose. Plaintiffs also received all the process they were due. This case should be dismissed on summary judgment as to all counts filed by the Plaintiffs against the Defendant City of Tupelo.

  This the 8th day of March, 2006.

            Respectfully submitted,

            CITY OF TUPELO, MISSISSIPPI

            s/<u>Berkley N. Huskison</u> (MSB 9582)
            Jeffrey J. Turnage (MSB 9447)

Of Counsel:

Mitchell, McNutt & Sams
215 Fifth Street North
P. O. Box 1366
Columbus, MS 39703-1366
PH: 662-328-2316

581529

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 8, 2006, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

    Jim Waide, Esquire
    Joseph Robert Murray, II, Esquire
    Walter Brent McBride, Esquire
    Waide & Associates, P.A.
    Post Office Box 1357
    Tupelo, MS 38802

    B. Wayne Williams, Esquire
    Reagan D. Wise, Esquire
    Webb, Sanders & Williams, P.L.L.C.
    Post Office Box 496
    Tupelo, MS 38802

This the 8th day of March, 2006.

                                                /s/Berkley N. Huskison